# In the United States Court of Federal Claims

No. 11-163C

(Filed Under Seal: June 23, 2011)
(Reissued: June 28, 2011)

| | |
|---|---|
| **CASTLE-ROSE, INC.,** ) | Standing in bid protests; timeliness under |
| ) | F.A.R. § 15.208; exceptions to late-is-late |
| **Plaintiff,** ) | rule; notice of lateness under F.A.R. |
| ) | 15.208(f); nonprejudicial errors; jurisdiction |
| **v.** ) | to consider in bid protests claims based upon |
| ) | the implied contractual covenant of good |
| **UNITED STATES,** ) | faith and fair dealing |
| ) | |
| **Defendant.** ) | |
| ) | |

Cyrus E. Phillips IV, Albo & Oblon LLP, Arlington, Virginia, for plaintiff.

Joshua A. Mandlebaum, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Virginia K. Ryan, Office of Counsel, United States Army Corps of Engineers, Seattle District, Seattle, Washington.

## OPINION AND ORDER[1]

Lettow, J.

In this post-award bid protest, plaintiff Castle-Rose, Inc. challenges the United States Army Corps of Engineers' ("Corps" or "USACE") determination that Castle-Rose's bid responding to solicitation request W912DW-19-R-0045 was received by the government too late to be considered for an award.

The proposal was turned over to the procurement technician at 2:06 p.m. — six minutes after the deadline. Castle-Rose's proposal was not considered, and the Corps awarded the contract to Advanced Technology Construction Corporation ("Advanced Technology"). Castle-

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before June 28, 2011. No redactions were requested.

Rose now contests the award on the grounds that its proposal was not late, that the Corps should have considered Castle-Rose's proposal even if it was late, and that Castle-Rose was prejudiced because it was not informed that its proposal would not be considered until approximately two months had passed from the delivery of its proposal.

## BACKGROUND[2]

### A. *Castle-Rose's Proposal*

On June 4, 2010, the United States Army Corps of Engineers' Seattle District issued solicitation request W912DW-19-R-0045.  *See* AR 15-84 (RFP No. W912DW-10-R-0045).[3] The solicitation sought demolition and disposal services for a decommissioned groundwater treatment plant and other items located at the Wykoff/Eagle Harbor Superfund Site at Bainbridge Island, Washington.  AR 15-92.

Item eight of the solicitation instructed bidders to address their offers to the location in item seven, "USA Engineer District, Seattle[;] ATTN: CECT-NWS-CT[;] PO Box 3755[;] Seattle, WA 98124-3755."  AR 15-92.  Item eight alternatively specified that "[h]and[-]carr[ied]" offers should be brought to "Seattle District, USACE[;] 4735 E. Marginal Way South."  AR 15-92.  Item nine of the solicitation added, "Sealed offers . . . will be received at the place specified in Item 8, or if hand[-]carried, in the depository located in Contracting Division, 2nd Floor, Col C-5 until 2:00 PM local time July 7, 2010."  AR 15-92.

The proposal was amended four times, and each amendment noted, "The proposal submittal time and date of Wednesday, July 7, 2010 at 2:00 p.m. LOCAL TIME remains the same."  AR 16-437 (First Amendment to Solicitation); AR 17-439 (Second Amendment to Solicitation) ("The proposal submittal time and date of July 7, 2010 at 2:00 p.m. LOCAL TIME remains the same."); AR 18-493 (Third Amendment to Solicitation); AR 19-550 (Fourth Amendment to Solicitation).

---

[2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement, *see Bannum v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (noting that bid protest proceedings "provide for trial on a paper record, allowing fact finding by the trial court"), and the parties' submissions related to prejudice and equitable relief, *see Vanguard Recovery Assistance, J.V. v. United States*, __ Fed. Cl. __, __ & n.9, 2011 WL 2120796, at *7 & n.9 (May 27, 2011); *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 204 n.11 (2004) (observing that the court, not the agency, is the initial fact finder as to prejudice and equitable issues), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).

[3]"AR __" refers to the administrative record filed with this court in accord with RCFC 52.1(a).  The administrative record has been subdivided into tabs.  The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page number of the administrative record, *e.g.*, "AR 5-26."  The pages of the administrative record are paginated sequentially without regard to the tabs.

"It is the standard practice for a contracting employee to await last-minute hand-delivered proposals in the main lobby on the first floor [of the building in which the Contracting Division is housed], as non-Corps personnel require an escort to access the second floor." AR 2.1-6 (Mem. of Scott Britt, Contract Specialist (Sept. 28, 2010) ("Britt Mem.")); AR 2.3-9 (Mem. of Sonia Frees, Procurement Technician (Sept. 28, 2010) ("Frees Mem.")). Accordingly, Ms. Frees averred that on July 7, 2010, from 1:30PM to 2:00PM, "I was in the lobby of the USACE building awaiting proposals by offerors. At 2:00 PM by the lobby clock, since there were no additional offerors in the lobby and the time for receipt of the bids had ended, I returned to my desk and reported to the Contract Specialist, Scott Britt, that there were no additional proposals received." AR 2.3-9 (Frees Mem.); *see also* AR 2.1-6 (Britt Mem.) (stating the same).

After Ms. Frees left the lobby, a messenger from Castle-Rose, Raymond Kessler, arrived in the lobby to deliver Castle-Rose's proposal for the solicitation. *See* AR 1-2 (Contracting Officer's Finding and Recommendation: Agency Protest (Oct. 20, 2010)); AR 5-30 (Castle-Rose's Agency Protest). A security guard gave Mr. Kessler a four-digit telephone number to call Ms. Frees using the lobby telephone. AR 1-2; AR 5-30. Mr. Kessler misinterpreted this number as Ms. Frees' room number, proceeded to enter the elevator, and was stopped by the security guard. AR 1-2; AR 5-30. The government represents that Mr. Kessler also tried to climb up the stairs and was stopped again. AR 1-2. The security guard then called Ms. Frees and told her that a representative from Castle-Rose had arrived in the main lobby with a proposal. AR 1-2. Ms. Frees states she received the call at 2:06 p.m. and returned to the lobby to meet with Mr. Kessler. AR 2.3-9 (Frees Mem.); *see also* AR 1-2. She says she told Mr. Kessler that Castle-Rose's "proposal would be marked late and that it would be up to the Contracting Officer to accept it or not." AR 2.3-9. Ms. Frees then brought the boxes to Mr. Britt's desk. The boxes in which the proposals arrived were marked as arriving at 14:06, 2:06 p.m. in military time. *See* AR 3.1-10 to 3.6-15 (Photographs of Castle-Rose's Unopened Proposals). Mr. Britt also wrote "LATE" across the two boxes. *See* AR 2.1-6; AR 3.1-10 to 3.6-15. He put the boxes in a secure area, but "did not remember" to send Castle-Rose a written confirmation that the proposal was late. AR 2.1-6 (Britt Mem.).

On September 8, 2010, Castle-Rose's vice president, Jason Smith, sent an email to Mr. Britt asking when the contract award would be made. AR 2.1-6 (Britt Mem.). Mr. Britt answered, saying an award was expected prior to September 30, 2010. AR 4.1-16 (E-mail from Britt to Smith (Sept. 8, 2010)). He then sent a follow-up e-mail stating, "By the way, Jason — you realize that your proposal was late and was not evaluated, right?" AR 4.2-20 (E-mail from Britt to Smith (Sept. 8, 2010)). Mr. Smith answered,

> From what we were [told] by our bid runner — he was inside the building at the bid due time — but he wasn't sure where to go. It did get clocked in 6 minutes late — but we were anticipating that the bid would still be accepted due to the fact we were in the building on time.

AR 4.2-20 (E-mail from Smith to Britt (Sept. 28, 2010)). Mr. Britt replied, "No, the proposal is not acceptable even one minute after the proposal due date time. . . . In the future, your courier

should arrive with ample time to spare in case he [or] she does not know [his or her] way to the front door of Federal Central South."  AR 4.2-19 to 20 (E-mail from Britt to Smith (Sept. 8, 2010)).  Mr. Smith replied again,

> I appreciate the feedback.  If we could double check what actually happened — I believe our courier was inside the front door at East Marginal Way (we've delivered many proposals there) on time.
> If he wasn't, we certainly take responsibility for that.  His version of events is that he was inside the door at bid time, had to be redirected through security a second time, was then directed to a room for delivery and redirected to another individual [who] then stamped the proposal in (after the due time).
> I apologize for only addressing this now, but I wasn't aware that our bid had not been accepted.

AR 4.2-19 (E-mail from Smith to Britt (Sept. 8, 2010)).  Mr. Britt did not respond to this e-mail.

## B. *Procedural History*

Castle-Rose learned through a notice published on the FedBizOpps website that the demolition and disposal services contract had been awarded to Advanced Technology on September 24, 2010.  *See* AR 21-557 (FedBizOpps Notice of Contract Award).   On September 28, 2010, Castle-Rose submitted an agency-level protest of the award to Contracting Officer Bonilie L. Lackey, arguing that its proposal should have been considered timely, that it had never received notice that the proposal was late as required by 48 C.F.R. ("F.A.R.") § 15.208(f), and that if it had received prompt notice, "Castle-Rose would have immediately obtained the necessary oral testimony from security guards and contracting representatives" that would show the proposal had been delivered on time.  AR 5-30 to 31.

The Corps issued a decision on Castle-Rose's agency protest on October 8, 2010, ruling that Castle-Rose's protest had been untimely.  The Corps noted that F.A.R. § 33.103 provided, "[P]rotests shall be filed no later than 10 days after the basis of the protest is known or should have been know, whichever is earlier" but that "[t]he agency, for good cause shown, or where it determines that a protest raises [significant] issues . . . , may consider the merits of any protest not timely filed."  AR 6-36 (Agency Protest Decision).  The Corps explained that Castle-Rose should have known its basis for protest on September 8, after receiving the email from Mr. Britt stating Castle-Rose's proposal was late and would not be evaluated, and that Castle Rose's agency protest thus had been filed outside of the ten-day protest window.  AR 6-36.  Nonetheless, the agency noted that Castle-Rose's protest would have still "fail[ed] on the merits" because the "proposal was correctly determined to be late and ineligible for consideration for award."  AR 6-37.

4

On October 18, 2010, Castle-Rose filed a protest with the Government Accountability Office ("GAO"), arguing that its agency-level protest should have been considered timely and that its contract proposal should have been considered by the Corps.  AR 7.1-47 (Castle-Rose's GAO Protest (Oct. 18, 2010)).  GAO dismissed Castle-Rose's protest on November 1, 2011, explaining, "Castle-Rose's agency-level protest was not timely under our [r]egulations, and therefore its subsequent protest to [GAO] will not be considered."  AR 10-63 (*Castle-Rose Inc.*, B-404265 (Nov. 1, 2010)).  Castle-Rose requested reconsideration of GAO's decision, AR 11-66 to 69 (Castle-Rose's Request for Reconsideration of GAO's Decision (Nov. 10, 2010)); and GAO denied the request, stating "the protester merely repeats arguments it made in its protest, disagrees with the decision, and has not presented any error of law to warrant reconsideration." AR 12-73 (*Castle-Rose Inc.*, B-404265.2 (Jan. 18, 2011)).  Castle-Rose then wrote a letter urging the Corps to reconsider its protest decision, AR 13-75 to 81 (Letter from Smith to Lackey (Feb. 8, 2011)), which the Corps declined, AR 14-82 (Letter from Patricia A. Blackwood, District Contracting Chief, to Smith (Feb. 10, 2011)).

On March 17, 2011, Castle-Rose filed a complaint in this court, protesting the award of the demolition and disposal services contract to Advanced Technology.  Castle-Rose asks the court to issue a declaration that its proposal submission was timely, that the Corps failed to provide appropriate notice that the proposal had been deemed late, that the Corps' justification for rejecting Castle-Rose's proposal was arbitrary and capricious, and that awarding the contract to Advanced Technology despite Castle-Rose's lower bid price was contrary to the terms of the solicitation.  Compl. at 23-24.  Castle-Rose further requests that the court remand this matter to the Corps, with instructions to consider Castle-Rose's proposal as timely submitted and directing the Corps to render a new decision on the award.  Compl. at 25.[4]  Finally, Castle-Rose requests that the court issue a "[d]eclaration that Castle-Rose is entitled to equitable relief, and money damages" for the Corps' failure to consider Castle-Rose's proposal as timely submitted.  Compl. at 25.

## JURISDICTION (STANDING)

The government first contests Castle-Rose's standing to challenge the Corps' award to Advanced Technology.  To establish standing in a bid protest action in this court, a petitioner must be an "interested party."  28 U.S.C. § 1491(b)(1).  Interested parties are "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *American Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001); *see also Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008); *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  To establish a direct economic interest as a putative prospective bidder, a plaintiff must prove that it had a "substantial chance" of being awarded the contract.  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009); *Rex Serv. Corp.*, 448 F.3d at 1308.  The government claims that Castle-Rose does not qualify as an interested party "[b]ecause [i]ts [p]roposal [w]as [l]ate."  Def.'s Mot. at 21 (heading).  Quoting *Labatt Food Service*, the

---

[4]Castle-Rose withdrew the request for a remand on June 21, 2011.

government argues, "'A late proposal is tantamount to no proposal at all. Such a party has no "substantial chance" of award.'"  *Id*. at 22 (quoting 577 F.3d at 1381).

Castle-Rose's position is readily distinguished from the posture of the *Labatt* protestor. In *Labatt*, the protester alleged errors in the procurement process but did not dispute that it had belatedly responded to a solicitation amendment.  The Federal Circuit found that the plaintiff lacked standing because, having submitted its response to the amendment late, it no longer had a substantial chance — or any chance — of winning the contract.  *Labatt Food Serv.*, 577 F.3d at 1381.

The government wrongly attempts to apply *Labatt*'s reasoning to Castle-Rose by begging the question before the court, in effect saying that Castle Rose cannot dispute whether its proposal was late, because its proposal was late.  Here, Castle-Rose is disputing the very point upon which the government relies to try to eliminate its standing.  Whether or not the submission was late is a question to be resolved on the merits, and the answer to that question should not be presumed in the defendant's favor to deny a plaintiff the substantive review to which it is entitled.  *See Information Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1030 (D.C. Cir. 2003) ("[A] plaintiff's non-frivolous contention regarding the meaning of a statute must be taken as correct for purposes of standing. . . . Were that not the case, we would effectively be deciding the merits under the guise of determining the plaintiff's standing.") (internal citations omitted); *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 763-69 (2006) (concluding that a protestor has standing to contest its exclusion from a competition for a procurement); *Client Network Servs., Inc. v. United States*, 64 Fed. Cl. 784, 788-89 (2005) (same); *cf. Claybrook v. Slater,* 111 F.3d 904, 907 (D.C. Cir. 1997) ("Whether a plaintiff has a legally protected interest (and thus standing) does not depend on whether he can demonstrate that he will succeed on the merits. Otherwise, every unsuccessful plaintiff will have lacked standing in the first place.").

Castle-Rose unquestionably has standing to challenge the Corps' elimination of its proposal from the competition for an award.  Castle-Rose has pled sufficient facts to raise the question of whether its submission was properly deemed as late, and but for the determination of lateness, Castle-Rose would have been eligible for an award.  It is undisputed that Castle-Rose's bid was "substantially lower" than the $1,310,271 contract awarded to Advanced Technology. *See* Compl. ¶ 9.  The solicitation announced, "The basis of [the] contract award will be [a] tradeoff analysis between technical factors and price to determine the best value to the [g]overnment.  Selection will be on the basis of the responsible offer, which conforms to the [Request for Proposal] and represents the most advantageous offer to the [g]overnment." AR 15-199 (Solicitation).  Although price was not the only factor on which the contract would be awarded, Castle-Rose's substantially lower bid illustrates that Castle-Rose's bid would have likely been competitive had it been evaluated by the Corps.  If its proposal was timely received, Castle-Rose had a substantial chance of award and qualifies as an interested party.  The government's standing argument fails.

## STANDARDS FOR DECISION

Under 28 U.S.C. § 1491(b)(4), this court's review of an agency's decision regarding a contractual solicitation or award is governed by the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706.[5]  Given this incorporation by reference, the court may set aside an agency contracting decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to application of factors governing equitable relief.  *See PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004).  Judicial review is limited to determining whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction).

An agency's decision will be upheld even if the court might have applied the procurement regulations in a different fashion had the court been in the agency's position.  *See Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); *Lumetra v. United States*, 84 Fed. Cl. 542, 549 (2008) ("[T]he court 'will not second guess the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement.'" (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996))).  A court must not "'substitute its judgment for that of the agency,'" *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Park*, 401 U.S. at 416), and it may overturn an agency's decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

When a court reviews a challenge to agency action that is alleged to be arbitrary or capricious or an abuse of discretion, it is obliged to "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Impresa Construzioni*, 238 F.3d at 1332-33 (quotation marks and citations omitted).  "[T]he disappointed bidder thus bears a heavy burden of showing that the award decision had no rational basis."  *Id.* at 1333 (quotation marks and citations omitted).  An agency's decision lacks a rational basis if the contracting officer "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Keeton Corrs.*, 59 Fed. Cl. at 755 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "When a challenge is brought on [a claimed contravention of law], the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  *Impresa Construzioni*, 238 F.3d at 1333 (quotation marks and citations omitted).

---

[5]Section 1491(b)(4) of Title 28 provides: "In any action under [28 U.S.C. § 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."

# ANALYSIS

## A.  *Untimeliness*

The crux of Castle-Rose's case is its argument that its proposal should not have been considered late and should have been evaluated by the Corps.  F.A.R. § 15.208(a) explains, "Offerors are responsible for submitting proposals . . . so as to reach the [g]overnment office designated in the solicitation by the time specified in the solicitation."  Lateness is governed by F.A.R. § 15.208(b)(1), the so-called "late is late" rule. Subsection 15.208(b)(1) provides,

> Any proposal, modification, or revision, that is received at the designated [g]overnment office after the exact time specified for receipt of proposals is "late" and will not be considered unless it is received before award is made, the contracting officer determines that accepting the late proposal would not unduly delay the acquisition; and —

> (i) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the [g]overnment infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or

> (ii) There is acceptable evidence to establish that it was received at the [g]overnment installation designated for receipt of proposals and was under the [g]overnment's control prior to the time set for receipt of proposals; or

> (iii) It was the only proposal received.

Exceptions (i) and (iii) are plainly inapplicable to this protest.  Only exception (ii) is disputed.

Castle-Rose makes four arguments that its proposal should not have been have been considered late.  Principally, Castle-Rose argues that its courier reached the proper location to submit proposals on time.  Additionally, Castle-Rose argues that its proposal should have been accepted under the "government control" exception of F.A.R. § 15.208(b)(1)(ii), that its proposal was delayed due to unanticipated events, and that its proposal was delayed due to improper governmental action.

### 1.  *Place and time of proposal delivery.*

Castle-Rose argues that the solicitation was ambiguous as to the location to which hand-delivered proposals had to be delivered and that "the place for submission of hand-carried [c]ompetitive [p]roposals in response to the [s]olicitation was . . . the first-floor lobby of . . . 4735 East Marginal Way South."  Pl.'s Br. at 11-12.  Item eight of the solicitation specified that

"[h]and[-]carr[ied]" offers should be brought to "Seattle District, USACE[;] 4735 E. Marginal Way South." AR 15-92. Correspondingly, item nine of the solicitation specified, "Sealed offers . . . will be received at the place specified in Item 8, or if hand[-]carried, in the depository located in Contracting Division, 2nd Floor, Col C-5 until 2:00 PM local time July 7, 2010." AR 15-92. Castle-Rose maintains that, because it was the practice of the Corps to accept proposals in the lobby of the building, all that should have been required of its courier was reaching the lobby of 4735 E. Marginal Way by 2:00 p.m., in accord with the requirement of item eight. However, items eight and nine of the solicitation must be read together. Castle-Rose was required to deliver the proposal to the second floor of 4735 E. Marginal Way, although F.A.R. § 15.208(b)(1)(ii) would permit the proposal to be turned over to a government official in the lobby. However, the government was not obliged to accept proposals in the lobby.

Notwithstanding whether the courier had to physically turn over Castle-Rose's proposal to the government by 2:00 p.m. or merely reach the lobby by 2:00 p.m., Castle-Rose has failed to establish the single fact crucial to its success in this case — that its courier arrived in the lobby on time.

Castle-Rose maintains its courier arrived in the lobby before 2:00:59 p.m. and argues that the decision by GAO in *Haskell Co.*, B-292756, 2003 CPD ¶ 202, 2003 WL 22740610 (Comp. Gen. Nov. 19, 2003), supports the argument that a proposal due at "2:00 p.m." is not late until after 2:00:59 p.m. In *Haskell*, a protestor challenged an award to its competitor, arguing that the competitor's proposal should have been rejected as late. 2003 WL 22740610, at *1. The solicitation had stated that the deadline for receipt of proposals was 2:00 p.m., and the challenged award had been granted to a proposal accepted between 2:00:00 p.m. and 2:00:59 p.m. *Id.*, at *2. *Haskell* held,

> [T]he [Request for Proposal]'s reference to a closing time of 14:00 hours could reasonably be interpreted either as requiring that proposals be received by 14:00:00, or as requiring that they be received by 14:00:59. To the extent that is viewed as an ambiguity in the solicitation, it was one that was obvious from the face of the [Request for Proposal], and we have repeatedly held that an offeror who chooses to compete under a patently ambiguous solicitation does so at its peril and cannot later complain when the agency proceeds in a manner inconsistent with one of the possible interpretations. . . . Accordingly, if the record establishes that [the allegedly late] proposal was received prior to 14:01:00, we think that the agency need not have rejected it as late.

*Id.*, at *3.  *Haskell* explains that a 2:00 p.m. deadline could reasonably be interpreted as *either* 2:00:00 p.m. or 2:00:59 p.m.  Because either deadline is reasonable, *Haskell* does not stand for the proposition that the government *must* hold open a 2:00 p.m. solicitation period until 2:00:59 p.m., but rather that it *may*.

But regardless of whether a proposal arriving during the specified minute of a relatively precise deadline is late, Castle-Rose's position that the courier arrived before 2:01 p.m. is unsupported by the facts in the administrative record.  Ms. Frees, the procurement technician, avers that she left the lobby when the lobby clock struck 2:00 p.m. and that she received the phone call from the security guard to meet with Castle-Rose's courier, Mr. Kessler, at 2:06 p.m. AR 2.3-9 (Frees Mem.).  The boxes in which the proposals arrived were marked as arriving at 2:06 p.m. as well.  *See* AR 3.1-10 to 3.6-15.  There is no evidence in the administrative record supporting the claim that Mr. Kessler arrived before 2:00:59 p.m. other than hearsay.  Mr. Smith wrote in emails, "[W]e were [told] by our bid runner — he was inside the building at the bid due time."  AR 4.2-20; *see also* AR 4.2-19 ("[The courier's] version of events is that he was inside the door at bid time.").[6]

Ms. Frees states she was called from the lobby at 2:06 p.m. and received Castle-Rose's proposal at that time.  When the proposal was brought to Mr. Britt's desk, he marked the proposals as "LATE."  *See* AR 2.1-6; AR 3.1-10 to 3.6-15.  Mr. Britt determined that the proposal had arrived late.  Given the facts in the administrative record, the court cannot say that this determination was an error in judgment.  Castle-Rose bears the burden of showing its proposal arrived on time and that the Corps should have determined its arrival was timely.  Based on the factual record in hand, Castle-Rose has failed to meet this burden.

    2.  *Government-control exception.*

Castle-Rose relatedly contends that the "government control" exception of F.A.R. § 15.208(b)(1) indicates that its proposal should have been evaluated.  This regulatory provision states, in pertinent part:

> Any proposal . . . that is received at the designated [g]overnment office after the exact time specified for receipt of proposals is "late" and *will not be considered unless* it is received before award is made, the contracting officer determines that accepting the late proposal would not unduly delay the acquisition; and . . . *[t]here is acceptable evidence to establish that it was received at the [g]overnment installation designated for receipt of*

---

[6]F.A.R. § 52.215-1(c)(3)(iii) specifies, "Acceptable evidence to establish the time of receipt at the [g]overnment installation includes the time/date stamp of that installation on the proposal wrapper, other documentary evidence of receipt maintained by the installation, or oral testimony or statements of [g]overnment personnel."  No evidence of this nature, nor of any another nature, supports Castle-Rose's contention.

> proposals and was under the [g]overnment's
> control prior to the time set for receipt of proposals.

F.A.R. § 15.208(b)(1)(ii); *see also* F.A.R. § 52.215-1(c)(3)(ii)(A) (same).

Castle-Rose argues that the proposal was "received" and "under the [g]overnment's control prior to the time set for receipt of proposals." Pl.'s Br. at 40. As explained in the previous section, there is not sufficient evidence that Castle-Rose's courier, Mr. Kessler, arrived at the lobby before 2:01 p.m., and Castle-Rose's argument that the proposal was received before 2:01 p.m. resultingly fails.

However, even if Castle-Rose's courier had arrived on time, Castle-Rose's argument regarding the government-control exception still fails to be persuasive. Castle-Rose avers that the court should find the proposal was under government control the moment Mr. Kessler stepped into the lobby. Castle-Rose cites no law or precedent supporting the proposition that a proposal can be under government control while it physically remains in the hands of the bidder. To the contrary, "[i]n non-electronic commerce cases, the GAO has determined that the [g]overnment receives a bid at the time the bidder relinquishes control." *Watterson Constr. Co. v. United States*, __ Fed. Cl. __, __, 2011 WL 1137330, at *6 (Mar. 29, 2011) (citing *Weeks Marine, Inc.*, B- 292758, 2003 CPD ¶ 183, 2003 WL 22383046 (Comp. Gen. Oct. 16, 2003)). To "relinquish control" of a hand-delivered proposal, the offeror must permanently transfer control of the proposal to the government. *See Immediate Sys. Res., Inc.*, B-292856, 2003 CPD ¶ 227, 2003 WL 22922370, at *3 (Comp. Gen. Dec. 9, 2003); *Weeks Marine*, 2003 WL 22383046, at *3.

Castle-Rose's courier did not relinquish control of the proposal until 2:06 p.m., past the deadline for receipt of proposals. Had Castle-Rose's courier given its proposal to the guard when he entered the lobby, the result of this analysis might have been different. But under the facts before the court, Castle-Rose cannot rely on the government control exception to prevail.[7]

    3.   *Unanticipated-events exception.*

Castle-Rose also argues its proposal should be considered under the "unanticipated events" exception to the late-is-late rule. F.A.R. § 15.208(d) provides, "If an emergency or unanticipated event interrupts normal [g]overnment processes so that proposals cannot be received at the [g]overnment office designated for receipt of proposals by the exact time specified in the solicitation, and urgent [g]overnment requirements preclude amendment of the solicitation closing date, the time specified for receipt of proposals will be deemed to be extended." *See also* F.A.R. § 52.215-1(c)(3)(iv). This exception "focuses upon whether

---

[7]The government argues that F.A.R. § 15.208(b)(1)(ii) should be read as limited to what it terms a "mail room" exception. Quoting *Shirlington Limousine & Transp., Inc. v. United States*, 77 Fed. Cl. 157, 171 (2007), it argues that the government-control exception "only makes sense if a proposal was sent from one part of a [g]overnment installation to the designated office by a [g]overnment agent in the ordinary course of business." Def.'s Mot. at 17. The court sees no reason to construe F.A.R. § 15.208(b)(1)(ii) solely in this way.

unforeseen events prevent the government from receiving proposals at the site designated, not on whether unforeseen events prevent the offeror from transmitting its proposal." *Conscoop-Consorzia Fra Coop. Di Prod. E Lavoro v. United States*, 62 Fed. Cl. 219, 241 (2004), *aff'd*, 159 Fed. Appx. 184 (Fed. Cir. 2005). Castle-Rose contends that Ms. Frees' leaving the lobby when the clock struck 2:00 p.m., rather than at 2:00:59 p.m., was an "unanticipated event." *See* Pl.'s Br. at 43-44.

Ms. Frees' leaving the lobby at 2:00 p.m. would be expected and reasonable when she was sitting in the lobby to collect proposals which were due at 2:00 p.m. *See Haskell Co.*, 2003 WL 22740610, at *3 ("[A] closing time of 14:00 hours could reasonably be interpreted either as requiring that proposals be received by 14:00:00, or as requiring that they be received by 14:00:59."). Additionally, F.A.R. § 15.208(d) only applies when "urgent [g]overnment requirements preclude amendment of the solicitation closing date." There is no indication, nor has Castle-Rose argued, that urgent requirements precluded amendment of the solicitation. As a result, Castle-Rose cannot succeed in applying the "unanticipated events" exception.

   4.  *Improper-government-action exception.*

Finally, Castle-Rose alleges that improper government action caused Castle-Rose's timing of delivery. When "improper government action was the paramount cause for the late submission, and where consideration of the proposal would not compromise the integrity of the competitive process," a late, hand-carried proposal may be considered for a contract award. *ALJUCAR LLC*, B-401148, 2009 CPD ¶ 124, 2009 WL 1588827, at *2 (Comp. Gen. June 8, 2009); *see also Shirlington Limousine*, 77 Fed. Cl. at 168-69. Improper government action is "affirmative action that makes it impossible for the offeror to deliver the proposal on time." *ALJUCAR*, 2009 WL 1588827, at *2; *see also Shirlington Limousine*, 77 Fed. Cl. at 170 (citing *Hospital Klean of Tex., Inc. v. United States,* 65 Fed. Cl. 618, 622-24 (2005)). The government's action does not qualify as the "paramount" cause for late submission where "the offeror or its agent contributed significantly to the late receipt *by not acting reasonably in fulfilling its responsibility* to deliver a hand-carried proposal to the proper place by the proper time, even though late receipt may have been caused in part by erroneous government action." *Shirlington Limousine*, 77 Fed. Cl. at 169 (quoting *Hospital Klean,* 65 Fed. Cl. at 622) (internal quotation marks omitted).

Castle-Rose claims that a 2:00 p.m. deadline is really a 2:00:59 p.m. deadline and that it was improper for Ms. Frees to leave the lobby of the building before 2:00:59 p.m. Ms. Frees was not under any legal obligation to wait in the lobby to accept proposals. Although the government concedes that it is standard practice for one of its employees to accept hand-delivered proposals in the lobby near the proposal deadline, Ms. Frees' stated decision to leave the lobby when the clock struck 2:00 p.m. cannot be deemed "improper." Indeed, Ms. Frees did not have to be standing in the lobby at all because the terms of solicitation specified that proposals had to be delivered to the second floor of 4735 E. Marginal Way South, not to the lobby.

B.  *Notice of Lateness*

Castle-Rose separately alleges that the Corps violated that portion of F.A.R. § 15.208(f) which requires "[t]he contracting officer [to] promptly notify any offeror if its proposal . . . was received late, and [to] inform the offeror whether its proposal will be considered, unless contract award is imminent and the [post-award] notice prescribed in 15.503(b) would suffice." Castle-Rose did not learn that its proposal had not been considered until September 8, 2010, when Mr. Britt emailed Castle-Rose's vice-president asking, "[Y]ou realize that your proposal was late and was not evaluated, right?" AR 4.2-20. Mr. Britt admits that after he wrote "LATE" on the proposal, he "put the box in a secure area . . . . [W]ith the box out of sight[] (and out of mind)[,] [he] did not remember to send [Castle-Rose] a written confirmation that [the] proposal was . . . late" until his e-mail exchange with Castle-Rose's vice-president, Mr. Smith, on September 8, 2010. AR 2.1-6.

The government argues that Ms. Frees' comment to Castle-Rose's courier sufficed as notice. When Ms. Frees accepted Castle-Rose's proposal, she told the courier that Castle-Rose's "proposal would be marked as late and that it would be up to the Contracting Officer to accept [it] or not." AR 2.3-9. This statement, however, is not sufficient for two reasons. First, Ms. Frees did not inform the courier that the proposal would not be considered, as required by the language of F.A.R. § 15.208(f). She stated that "it would be up to the Contracting Officer to accept [the proposal] or not." AR 2.3-9. This statement explicitly leaves the question of consideration open. Second, Ms. Frees is not the contracting officer. F.A.R. § 15.208(f) specifies that notice must be given by the contracting officer, in this case, Ms. Bonilie Lackey. *See* AR 15-92 (identifying the contracting officer). The government argues that the contracting officer can delegate this duty. In this respect, F.A.R. § 2.101 provides, "The term [contracting officer] includes certain authorized representatives of the contracting officer acting within the limits of their authority as delegated by the contracting officer." Nonetheless, although the contracting officer can delegate her duties, there is no indication that Ms. Lackey did delegate her duty to notify bidders when their proposals were late and would not be accepted.

The government violated its duty under F.A.R. § 15.208(f) to notify Castle-Rose that its proposal was late and would not be considered. However, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir. 1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed. Cir. 1996)). Had the contracting officer immediately notified Castle-Rose that its proposal was late and would not be considered, the result of the procurement would have been the same.

Castle-Rose argued in its agency protest, and again argues here, that "[b]ut for the government delay in notification, Castle-Rose would have immediately obtained the necessary oral testimony from security guards and [the] contracting representative that constitutes acceptable evidence of on-time delivery." AR 5-31; *see also* Pl.'s Br. at 21, 45. This contention, however, is not convincing. Castle-Rose learned that its proposal was not considered on

September 8, 2010, and it filed its agency protest on September 28, 2010.  *See* AR 5-31.  In the twenty days between receiving notice and filing its protest, there is no indication that Castle-Rose attempted to "obtain the necessary . . . testimony" from the security guard on duty July 7 or the courier it used to deliver the proposal.  Because Castle-Rose did not take measures to obtain the evidence it wanted after receiving notice, the court does not accept that learning of the proposal's lateness in July rather than September would have enabled Castle-Rose to develop a more favorable evidentiary record.

The government's failure to provide prompt notice to Castle-Rose was, therefore, not prejudicial and does not justify overturning the contractual award to Advanced Technology.

## C.  *Written Justification*

Castle-Rose also contends that the government's written justification, required by F.A.R. § 15.208(h)(2), for finding Castle-Rose's proposal late was "arbitrary and capricious."  F.A.R. § 15.208(h)(2) requires that "the contracting office files for each late proposal . . . [must include] (1) [t]he date and hour of receipt[,] (2) [a] statement regarding whether the proposal was considered for award, with supporting rationale[, and] (3) [t]he envelope, wrapper, or other evidence of date of receipt."  Castle-Rose argues that the only plausible "statement . . . with supporting rationale" is the contracting officer's "Finding and Recommendation[:] Agency Protest" dated October 20, 2010, twelve days after the agency protest decision was rendered.  *See* AR 1-1 (Contracting Officer's Finding and Recommendation: Agency Protest (Oct. 20, 2010)).  The contracting officer's report largely copies verbatim portions of the agency protest decision.  *Compare, e.g.*, AR 1-4 to 5 (¶¶ 1-2) *with* AR 6-39 (¶¶ 17-18).  Apart from that circumstance, and the result, Castle-Rose does not specify what it finds "arbitrary and capricious" about the report.  To the extent that Castle-Rose argues the timing or copying of the report to be in violation of F.A.R. § 15.208(h)(2), any error is nonprejudicial, and would not have affected the outcome of the procurement.

## D.  *Implied-in-Fact Contract, F.A.R. § 1.102(b)(3) and F.A.R. § 1.102-2(c)(3)*

Finally, Castle-Rose argues that the government has violated an implied covenant of fair dealing and honest consideration attendant to an implied-in-fact contract to consider its proposal.  Pl.'s Br. at 44.  This allegation raises a question of whether the Court of Federal Claims has jurisdiction to hear a claim for breach of the implied covenant of good faith and fair dealing in a bid protest action.

Prior to the enactment of the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 110 Stat. 3870, Section 1491(a)(1) of the Tucker Act was construed as conferring jurisdiction on the Court of Federal Claims to hear bid protests based on an alleged breach of "'an implied contract to have the involved bids fairly and honestly considered'" during the procurement process.  *Resource Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1242 (Fed. Cir. 2010) (quoting *Central Ark. Maint., Inc. v. United States*, 68 F.3d 1338, 1341 (Fed. Cir. 1995) (quoting in turn *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir. 1983) (en banc)), and citing *Heyer Prods. Co. v. United States*, 140 F. Supp. 409, 414-15 (Ct. Cl. 1956)).  The ADRA expanded the jurisdiction of the Court of Federal Claims to hear

"the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims."  H.R. Rep. No. 104-841, at 10 (1996) (Conf. Rep.). The ADRA added to Section 1491 of title 28 a new subsection which included the following paragraph:

> (1) Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

Pub. L. No. 104-320, 110 Stat. at 3874 (codified as 28 U.S.C. § 1491(b)(1)).[8]

Whether jurisdiction to consider claims based upon the implied covenant of good faith and fair dealing survived the enactment of the ADRA had been for some time an open question in this court.  The Federal Circuit recently addressed that question and held that, "[i]mplied-in-fact contract jurisdiction [under 28 U.S.C. § 1491(a)] does survive as to claims where the new statute [28 U.S.C. § 1491(b)] does not provide a remedy. . . .  Congress intended the 1491(b)(1) jurisdiction to be exclusive where 1491(b)(1) provided a remedy (in procurement cases).  The legislative history makes clear that the ADRA was meant to unify bid protest law in one court under one standard."  *Resource Conservation*, 597 F.3d at 1245-46.

This language of *Resource Conservation* might be interpreted to suggest that the passage of the ADRA eliminated the Court of Federal Claims' jurisdiction to hear a claim for breach of the implied covenant of good faith and fair dealing under Section 1491(a).  However, *Resource Conservation* has been applied in varying ways.  Some decisions have held that the ADRA eliminated this court's jurisdiction to render judgment on an implied covenant of good faith and fair dealing in a bid protest action.  *See, e.g.*, *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 693 (2010) ("[T]he ADRA added subsection [] 1491(b)(1) . . . displacing the implied contract theory with an explicit statutory grant of jurisdiction to adjudicate bid protest actions."); *Metropolitan Van & Storage v. United States*, 92 Fed. Cl. 232, 249-50 n.7 (2010) ("The present case involves a bid protest of a procurement . . . .  [Section 1491(b)] provides exclusive jurisdiction in this court . . . and exclusive remedies . . . .  Under these circumstances, the implied-in-fact contract theory . . . [in] the complaint is not operative, and will not be further addressed in this opinion.").  However, other decisions subsequent to that in *Resource*

_____

[8]Section 12(d) of the ADRA, 110 Stat. 3875, provided in part that "[t]he jurisdiction of the district courts of the United States over the actions described in section 1491(b)(1) of title 28, United States Code (as amended by subsection (a) of this section) shall terminate on January 1, 2001 unless extended by Congress."  No such extension was made.

*Conservation* have held that this court maintained jurisdiction to adjudicate implied covenant of good faith and fair dealing claims in bid protests under Section 1491(a).  *See, e.g.*, *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 94 Fed. Cl. 394, 398 (2010) ("[A]n implicit repeal of [Section] 1491(a)'s procurement jurisdiction would run counter to the longstanding principle of statutory construction which recognizes a strong presumption against an implied repeal of a jurisdictional statute. . . . Without an express repeal . . . , the common law developed under [Section] 1491(a) permitting bid protests of procurements and [the] ADRA should be interpreted 'in a manner which gives harmonious operation and effect to both.'") (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 808 (1976); *United States v. Lahey Clinic Hosp. Inc.*, 399 F.3d 1, 9 (1st Cir. 2005), and quoting *United States v. Kenaan*, 557 F.2d 912, 917 (1st Cir. 1977)).

There is yet a third possible interpretation of *Resource Conservation*, hinted at in *L-3 Communications* and adopted in *Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 97 Fed. Cl. 96 (2010).  *Bilfinger Berger* held that Section 1491(b) granted this court jurisdiction to hear an implied contract claim brought in the context of a bid protest.  The court stated: "[T]he Federal Circuit did not determine that the ADRA precludes a protester from alleging a breach of an implied contract of fair dealing in a procurement case brought pursuant to [S]ection 1491(b). . . .  [A] protester may challenge arbitrary and capricious conduct based upon an implied-in-fact contract to consider bids fairly theory as part of a procurement protest in which Tucker Act jurisdiction is based upon 28 U.S.C. § 1491(b)(1)."  *Bilfinger Berger*, 97 Fed. Cl. at 151-52.[9]

Whether or not this court has jurisdiction to hear an implied-contract claim under Section 1491(a) in a bid protest action, the court agrees with *Bilfinger Berger* that it surely has jurisdiction to hear such a claim under Section 1491(b) as added by the ADRA.  *Resource Conservation* indeed stated, "Congress intended the [Section] 1491(b)(1) jurisdiction to be exclusive where [Section] 1491(b)(1) provided a remedy (in procurement cases)."  597 F.3d at 1246.  The court interprets this language to state that a protester can bring a claim for violation of the implied covenant of good faith and fair dealing; the jurisdiction for bringing the claim arises under Section 1491(b), not Section 1491(a).  Accordingly, Castle-Rose has stated a viable claim.

To recover under the implied covenant for bids to be fairly and honestly considered, a plaintiff has to establish arbitrary and capricious action by the government.  *Keco Indus., Inc. v. United States,* 492 F.2d 1200, 1203-04 (Ct. Cl. 1974).  One factor to address in this regard is a

_____

[9]Although the court in *Bilfinger Berger* stated it "adopt[ed] the reasoning set forth in *L-3 Communications Integrated Systems L.P.*," it appears that the holdings of *L-3 Communications* and *Bilfinger Berger* rest on somewhat different grounds.  The court in *L-3* held that the Court of Federal Claims' jurisdiction to hear implied contract of fair dealing claims remained under Section 1491(a).  *See* 94 Fed. Cl. at 397 ("Section 1491(a)(1) continues to allow any plaintiff, including a disappointed bidder, to invoke this [c]ourt's general contract jurisdiction to recover money damages, including bid preparation and proposal costs.").  However, in the final sentence of the opinion, the court added that the ADRA did not "affect a protestor's ability to argue breach of the implied contract of fair dealing in a bid protest where jurisdiction is predicated on [Section] 1491(b)."  *Id.* at 398.

proven violation of pertinent statutes or regulations. *Id.* In any action arising under Section 1491(b), the court is instructed to review the agency's decision pursuant to the "arbitrary, capricious, and abuse of discretion" standard set forth in 5 U.S.C. § 706(2)(A). This standard is essentially the same as that established for the implied contract requiring fair and honest bid consideration. *FAS Support Servs., LLC v. United States*, 93 Fed. Cl. 687, 694 (2010).

Castle-Rose alleges that the Corps breached the implied covenant by failing to abide by F.A.R. § 1.102(b)(3) and F.A.R. § 1.102-2(c)(3). Compl. at 22-23. Section 1.102(b)(3) states, "The Federal Acquisition System will . . . [c]onduct business with integrity, fairness, and openness." Section 102-2(c)(3) states, "The [g]overnment shall exercise discretion, use sound business judgment, and comply with applicable laws and regulations in dealing with contractors and prospective contractors. All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same." Castle-Rose claims, "These two procurement [r]egulations . . . define the reach and scope of the implied-in-fact [c]ontract of fair and honest consideration." Pl.'s Br. at 44 (citing *FFTF Restoration Co., LLC v. United States*, 86 Fed. Cl. 226, 237-38 (2009)).

Castle-Rose claims that these sections were contravened in three ways. First, Castle-Rose maintains that the Corps should have revealed earlier that Mr. Britt forgot about the proposals for a period of time. Pl.'s Br. at 45. Second, Castle-Rose argues that the Corps "never gave Castle-Rose the opportunity" to develop evidence that the proposal was under the government's control on time. *Id.* at 45. And finally, Castle-Rose claims that because the Corps "persisted in vesting the [a]gency's designated [c]ontract [s]pecialist with authority he never has had, USACE's Seattle District has wasted" the sum to be paid to Advanced Technology that exceeded Castle-Rose's bid. *Id.* at 46.

These supposed errors focus on Castle-Rose's lack of prompt notice from the contracting officer that its proposal would not be considered and the results of that delay. As the court discussed when addressing Castle-Rose's notice claim, the contracting officer's failure to give Castle-Rose prompt notice is a nonprejudicial error.

Additionally, Sections 1.102 and 1.102-2 of the F.A.R. have no binding legal force. They are directory, not mandatory. Section 1.102 is titled "Statement of guiding principles for the Federal Acquisition System." As the court explained in *Information Scis. Corp. v. United States*, 85 Fed. Cl. 195, 202 (2008): "F.A.R. § 1.102[(b)(3)] . . . does not 'impose explicit requirements, but merely indicates appropriate courses for [agency] officials to follow.' . . . This text . . . imposes no specific substantive obligations on the [g]overnment, and therefore is not judicially enforceable." (citing *Carolina Tobacco Co. v. Bureau of Customs and Border Prot.*, 402 F.3d 1345, 1349 (Fed. Cir. 2005)). Similarly, F.A.R. § 1.102-2(c) only provides "internal government direction" and "does not impose a specific, substantive obligation on the [g]overnment." *Information Sciences*, 85 Fed. Cl. at 202 (citing *American Tel. and Tel. Co. v. United States*, 307 F.3d 1374, 1380 (Fed. Cir. 2002)); *see also Farrell v. Department of Interior,* 314 F.3d 584, 591-92 (Fed. Cir. 2002) ("In this case, the document is called a 'Guide' . . . . It contains no mandatory language. . . . The [government] w[as] not bound by the [document].")); *Weston v. United States Dep't of Hous. & Urban Dev.,* 724 F.2d 943, 950 (Fed. Cir.1983) ("It is clear, therefore, that the penalties set forth in the guide are not inflexible outer limits."). Although

*FFTF Restoration* interpreted F.A.R. § 1.102(b)(3) and F.A.R. § 1.102-2(c)(3) as encompassing the requirements of the implied contract of fair dealing, *FFTF Restoration* predated *Resource Conservation* and was decided under the belief that the ADRA eliminated claims based upon the implied contract of fair dealing in bid protest cases.  In light of the *Resource Conservation* decision, the reasoning of *Information Sciences* is more persuasive.

Castle-Rose cannot base a claim involving implied contract of fair dealing on alleged contravention of F.A.R. §§ 1.102(b)(3), 1.102-2(c)(3), and Castle-Rose has not established that any arbitrary and capricious government action prejudiced its ability to receive a contract award. Its implied contract claim is therefore denied.[10]

## CONCLUSION

For the stated reasons, the government's motion to dismiss is DENIED.  The plaintiff's motion for judgment on the administrative record is also DENIED, but the government's motion for judgment on the administrative record is GRANTED.[11]  The Clerk shall enter judgment accordingly.

No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[10]Castle-Rose further alleged that the award to Advanced Technology was "not made on the factors specified in the Solicitation" in violation of 10 U.S.C. § 2305(b)(1) and was "made in violation of 10 U.S.C. § 2305(b)(4)(C) [because] the substantially lower [p]rice offered in Castle-Rose's initial [c]ompetitive [p]roposal [wa]s ignored."  Compl. at 21-22.  Having concluded that the Corps did not err in marking Castle-Rose's proposal late, claims concerning how Advanced Technology's and Castle-Rose's proposals should have been evaluated cannot be considered.

[11]Plaintiff's motion for leave to withdraw a single request for relief, *i.e.*, a remand, is GRANTED.